UNITED STATES of America,
Plaintiff-Appellee,

v.

Jack Wilbur TAVELMAN,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Steven JOB, Defendant-Appellant.

Nos. 80–1128, 80–1129.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 9, 1981.

Decided July 13, 1981.

As Amended on Denial of Rehearing
and Rehearing En Banc
Sept. 25, 1981.

FARRIS, Circuit Judge:

Jack Wilbur Tavelman and Steven Job appeal their convictions and sentences for violation of 21 U.S.C. §§ 841(a)(1), 846 (1976) (conspiracy to possess cocaine with intent to distribute) and of 18 U.S.C. § 1952(a)(3) (1976) (Travel Act) (interstate travel with acts in furtherance of intent to distribute cocaine). *See* 28 U.S.C. § 1291 (1976). We affirm *except* the imposition of special parole terms under 21 U.S.C. § 846 (1976), which we vacate.

## I. FACTS

Baron, an inmate at the Douglas County Jail, contacted DEA agent Cameron who accepted Baron's offer to assist the agency in apprehending persons involved in the distribution of narcotics in Los Angeles. When Baron went to Los Angeles in July, 1979, he took a photograph showing him holding several large bags filled with white powder giving the appearance of cocaine (but actually procaine). Through one Meekins, middle man, Baron met Silverman, another middle man. Over a period of four days, Silverman made a number of calls to defendant Job, attempting to entice him to fly to Reno to purchase some very good cocaine from a large dealer.[1] During a subsequent meeting at Job's house, Baron and Job discussed the quality and price of the cocaine and exchanged telephone numbers. During this conversation, Job expressed reservations about the proposed purchase because he already had one kilo of cocaine that he was attempting to sell. After three or four days in Los Angeles, Baron returned to Reno and reported that Job was not interested in purchasing cocaine. Over the next few days, however, Baron made six recorded telephone calls from the

Andrew M. Zanger, Los Angeles, Cal., for defendant-appellant.

Leland E. Lutfy, Asst. U. S. Atty., Las Vegas, Nev., for plaintiff-appellee.

Before SKOPIL and FARRIS, Circuit Judges, and BELLONI,* District Judge.

* The Honorable Robert C. Belloni, United States District Judge for the District of Oregon, sitting by designation.

1. During trial, Silverman testified over objection to a prior transaction occurring between himself, Tonkowicz ("Tea Bags"), and Job one month before the arrests. Silverman and Tonkowicz had encountered one another at a mutual friend's home. When Tonkowicz showed Silverman a pound of cocaine he had for sale, Silverman telephoned Job and went to Job's home with a small sample. Several days later, Silverman and Tonkowicz returned to Job's home, where Job gave Tonkowicz approximately $27,000. Another person at Job's home, identified by Silverman as Tavelman, had gone to the back of the house before the exchange of money.

Reno DEA office to Job in Los Angeles in which he increased the attractiveness of the trip to Reno. In his acceptance, Job mentioned that his friend Jack, an accountant, would travel with him to Reno to analyze the cocaine and would supply half the purchase money.

Job and Tavelman flew to Reno from Los Angeles on July 20, 1979 on Western Airlines flight # 144. Baron and Job met in the bar of the MGM Grand Hotel. Baron opened his brief case an inch or so to display two plastic 5-lb. bags of powder appearing to be cocaine. Job then took Baron to his room to show him $24,000 in cash, indicating that his friend had the other half of the purchase money in a room on the floor above. Job said that a cocaine laboratory had been set up in the bathroom of his friend's room. Baron and Job returned to the bar, where Baron retrieved his suitcase from Cameron, an alleged compatriot. They then went to the elevator, to go to Job's friend's room to test the cocaine. Several DEA agents got on the elevator with Baron and Job, including Cameron. On leaving the elevator and starting down the hallway, Job asked Baron if he was alone. Cameron, who had left the elevator on the same floor, then arrested Job. Job requested that they return to his room. A pouch containing money was seized and opened when the group returned to Job's room. An airline ticket which fell out of Job's coat was also seized. Approximately $1,000 was taken from Job's person.

Following Job's arrest, agent Cameron attempted to locate Job's partner, "Jack the accountant." The hotel management provided information that the only single man checking in on the same day as Job and occupying a room on the floor above was registered as "Jim Freeman" and was located in room # 2417. Cameron proceeded to that room, identified himself to Tavelman as a DEA agent investigating a narcotics arrest occurring earlier, and asked to be admitted. Tavelman admitted Cameron, who was accompanied by four other agents, to the room. In response to Cameron's questions, Tavelman admitted that he was an accountant, had registered under a false name, had $22,000 cash in the room, and had traveled from Los Angeles on the flight known by the agents to have been Job's. Tavelman denied knowledge of or involvement in the narcotics deal under investigation. Tavelman refused Cameron's request to search his bathroom and requested consultation with an attorney. Cameron then arrested Tavelman and read him the *Miranda* warnings. Tavelman's attempts to contact his attorney were unsuccessful. After arrest, Tavelman consented to the search. He took Cameron into the bathroom, where a cocaine laboratory was found. He also produced a purse with money in it and some cocaine. Cameron later testified at trial that, during this time, Tavelman had told him that if the cocaine tested out, "they were going to use the money to buy the coke." Later, Job and Tavelman met in the hallway of the DEA office. Job said, "Jack, I see they got you, too. I just want you to know that they didn't get you through me." Tavelman directed his response to Cameron. The parties disagreed on that response: He asked either "How did you get me?" or "How did you get that?"

On August 9, 1979, Tavelman and Job were indicted in the District of Nevada (1) for conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846 (1976) and (2) for interstate travel with intent to distribute cocaine toward which end acts were consummated in violation of 18 U.S.C. § 1952(a)(3) (1976).

Tavelman's and Job's pretrial motions to dismiss under Fed.R.Crim.P. 12(b) were denied in their entirety. Tavelman's motion to suppress evidence obtained from his hotel room, including his statements at that time, was denied in its entirety. At the same pretrial hearing, Job's motion to suppress the pouch and money seized from his hotel room was granted and his motion to suppress the airline ticket was denied. Tavelman's pretrial motion for a hearing to determine the admissibility of confessions, admissions, and assertive conduct, see 18 U.S.C. § 3501 (1976) (motion in limine), was also denied.

A three-day jury trial, commencing on January 16, 1980, resulted in convictions of both defendants on both counts of the indictment. At trial, defendants renewed their motions to suppress the statements made by Tavelman in his hotel room regarding the intended use of the money and by Job and Tavelman in the DEA office. The court ruled that Tavelman's statement in the hotel room would be excluded and that Job's and Tavelman's statements in the DEA office would be used only against the codefendant who made them. Later, the court ordered the defendants' statements at the DEA office stricken from the record and admonished the jury to disregard them. Defendants' motions for acquittal at the end of the prosecution's case were denied. The motions for acquittal were converted into motions for mistrial under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), for the three extrajudicial statements of the defendants. The court denied the mistrial motions but admonished the jury.

On February 25, 1980, Tavelman was sentenced to a five-year term on Count I with a special parole term of three years under 21 U.S.C. § 960 (1976) and to a two-year term, to run concurrently with that on Count I, and a $5,000 fine on Count II. Job was sentenced on the same day to an eight-year term on Count I with a special parole term of three years under 21 U.S.C. § 960 (1976) and on Count II to a four-year term, to run consecutively with that on Count I.

## II. SUFFICIENCY OF THE INDICTMENTS

■ An indictment must inform the defendant of "the nature and cause of the accusation." U.S.Const. amend. VI. *Accord,* Fed.R.Crim.P. 7(c)(1); *United States v. Cecil,* 608 F.2d 1294, 1296 (9th Cir. 1979) (per curiam). An indictment which tracks the offense in the words of the statute is sufficient if those words fully, directly, and expressly set forth all the elements necessary to constitute the offense intended to be proved. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590

(1974). The indictments of Tavelman and Job contained the specific dates of their alleged criminal violations, the statutory provisions under which the indictments issued, and brief descriptions in statutory terms of the nature of the criminal activity alleged.

### A. Count I

Count I of the indictments alleged that Tavelman and Job conspired, between July 12 and July 20, 1979, to possess cocaine with intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1), 846 (1976). Job and Tavelman contend that, although the existence of a substantive count may substitute for a definite statement of essential facts or overt acts, their indictments failed either to contain a substantive count or to allege essential facts or overt acts and were therefore constitutionally defective.

■ An indictment under 21 U.S.C. § 846 (1976) is sufficient if it alleges:

> a conspiracy to distribute drugs, the time during which the conspiracy was operative and the statute allegedly violated, even if it fails to allege or prove any specific overt act in furtherance of the conspiracy.

*United States v. Marable,* 578 F.2d 151, 154 (5th Cir. 1978), *overruled on other grounds, United States v. Rodriguez,* 612 F.2d 906, 919 & n.35 (5th Cir.) (en banc) (by implication), *cert. denied,* — U.S. ——, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980). Courts do not require as detailed a statement of an offense's elements under a conspiracy count as under a substantive count. *E. g., Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 301, 71 L.Ed. 545 (1927); *United States v. Pheaster,* 544 F.2d 353, 360–61 (9th Cir. 1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977). *United States v. Cecil,* 608 F.2d 1294, 1296–97 (9th Cir. 1979) (per curiam), on which defendants rely, is inapposite. The indictment in *Cecil* did not place the conspiracies in any time frame whatsoever. The Count I indictments were adequate.

## B. Count II

Count II of the indictments contained allegations that the defendants, on or about July 20, 1979, traveled from Los Angeles to Reno with intent to promote the unlawful activity of possession with intent to distribute cocaine (in violation of 21 U.S.C. § 841(a)(1) (1976)) and that, on that same day, they committed acts facilitating that unlawful activity in violation of 18 U.S.C. § 1952(a)(3) (1976). Job and Tavelman contend that their indictments under Count II were fatally defective because they failed to allege any specific overt acts committed in furtherance of the unlawful intent.

■ An indictment under the Travel Act requires allegations of each of the three elements of the crime: (1) interstate commerce or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of that unlawful activity. *See, e. g., United States v. Wander*, 601 F.2d 1251, 1258 (3d Cir. 1979); *United States v. Polizzi*, 500 F.2d 856, 897 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975). The indictments alleged that on July 20, 1979: (1) the defendants traveled interstate (between Los Angeles and Reno); (2) with the intent to promote a violation of 21 U.S.C. § 841(a)(1) (specifically the possession of cocaine with intent to distribute); and (3) thereafter knowingly performed acts facilitating that unlawful activity. These allegations are sufficient to state violations of 18 U.S.C. § 1952(a)(3). We reject the defendants' contentions.

## III. SEARCHES OF THE HOTEL ROOMS

### A. The Search of Job's Room

Job concedes that he requested, after his arrest in the hallway, that he and the agents return to his hotel room. He contends, however, that he did not consent to a search of his room and that the search was not supported by probable cause.

■ Upon conflicting evidence, the trial court found that Job had consented to the agents' entry into his room and that the airline ticket was in "plain view" when it was seized, *see generally Coolidge v. New Hampshire*, 403 U.S. 443, 464–71, 91 S.Ct. 2022, 2037–40, 29 L.Ed.2d 564 (1971). The record supports that finding. It is not clearly erroneous. *See United States v. Page*, 302 F.2d 81, 85 (9th Cir. 1962) (en banc) (standard of review for admissibility of evidence).

### B. The Search of Tavelman's Room

■ Tavelman contends that, because the agents' entry into his room was without probable cause, the evidence obtained there should have been suppressed under the Fourth Amendment. We understand but reject the argument. The court could properly find from the record that Tavelman consented to the agents' entry into his hotel room and to their search.

■ "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). A finding of consent by the trial judge should be reversed only if, viewing the evidence in the light most favorable to the government, this court concludes that it is clearly erroneous. *United States v. Wasserteil*, 641 F.2d 704, 707 (9th Cir. 1981) (quoting *United States v. O'Looney*, 544 F.2d 385, 388 (9th Cir.), *cert. denied*, 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976)).

■ Here, Tavelman gave indicia of consent when Cameron came to his hotel room door and asked to be admitted to question him about a recent narcotics arrest. Tavelman's election to contact his attorney at a time during the interview when he may have reasonably suspected that the investigation was focusing on him demonstrated an understanding of his *Miranda* rights. The burden is on Tavelman to show that the finding of consent was clearly erroneous. *See, e. g., United States v. Townsend*, 510 F.2d 1145, 1147 (9th Cir.

1975) (per curiam). He fails to carry that burden.

 Nor are Tavelman's Fifth Amendment objections compelling. Even if he preserved them on the record, the district court's determination that Tavelman was not in custody prior to his formal arrest was not clearly erroneous.

### IV. ADMISSIBILITY OF CODEFENDANTS' STATEMENTS

 Both defendants contend that the admission of their three extrajudicial statements violated their Sixth Amendment right to confrontation as articulated in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). These three statements, which were admitted into evidence at trial, were later ordered stricken from the record by the district judge who then admonished the jury to disregard them.

Cases subsequent to *Bruton* have distinguished—as admissible—a codefendant's admission which is a vague reference from which guilt might be inferred from other facts and evidence. *See, e. g., United States v. Belle*, 593 F.2d 487, 493–96 (3d Cir.) (en banc), *cert. denied*, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 277 (1979); *United States v. Wingate*, 520 F.2d 309, 313–14 (2d Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). Although the statements admitted here did serve to tie Tavelman and Job to one another in the crime, they were not incriminating without reference to other, admissible evidence. Further, even if there was *Bruton* error, it was harmless beyond a reasonable doubt, *see United States v. Longee*, 603 F.2d 1342, 1345 (9th Cir. 1979), in light of the nature of the statements, the striking of the statements and instructions by the court, and the overwhelming admissible evidence that also tied the defendants to one another. That other admissible evidence included Silverman's testimony about the cocaine purchase by Job a month earlier during which Tavelman was present; the identical Western Airlines' flight from Los Angeles to Reno (on which the defendants occupied first-class seats # # 4A and 4C); Job's statements and conduct at the hotel indicating the floor on which his friend was located; Tavelman's admission that he was an accountant, as Job had said, and from Los Angeles; and the cocaine laboratory found, as Job said it would be, in the bathroom of Tavelman's room. *See United States v. Buckner*, 610 F.2d 570, 574–75 (9th Cir. 1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1646, 64 L.Ed.2d 235 (1980).

### V. ENTRAPMENT AND DUE PROCESS CHALLENGES

 Both defendants contend that the government's role in "originating, conceptualizing, and engineering the entire plan" was entrapment. The defendants' entrapment defense fails factually because of the evidence adduced at trial. Government conduct which originates the criminal design and implants it in the mind of an innocent or unwilling defendant is entrapment. *Sherman v. United States*, 356 U.S. 369, 371–73, 78 S.Ct. 819, 820–21, 2 L.Ed.2d 848 (1958). To determine whether the government has implanted a criminal design in the mind of an otherwise innocent defendant, the court considers:

> the character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government.

*United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1336 (9th Cir. 1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978). The record supports the finding that there was no entrapment.

 Alternatively, the defendants argue that the government's conduct in "originating, conceptualizing, and engineering the entire plan" was so shocking that it should offend the court's "sense of justice." The Third Circuit has held that outrageous and

overreaching police involvement invalidated a conviction despite a showing of the defendant's predisposition. *See United States v. Twigg*, 588 F.2d 373, 378–80 (3d Cir. 1978). *See also United States v. Borum*, 584 F.2d 424, 427–30 (D.C.Cir. 1978). Although the record provides a basis for defendants' argument, it also satisfies us that the conduct complained of here does not reach that extreme area in which it is "outrageous" or "grossly shocking." *See United States v. McQuin*, 612 F.2d 1193, 1196 (9th Cir.), *cert. denied*, 445 U.S. 955, 100 S.Ct. 1608, 63 L.Ed.2d 791 (1980); *United States v. Smith*, 538 F.2d 1359, 1361–62 (9th Cir. 1976).

## VI. SUFFICIENCY OF THE TRAVEL ACT EVIDENCE

Defendants contend that the Travel Act contemplates convictions only for a continuous course of criminal conduct in interstate commerce and that such a continuous course was not shown by the evidence. Defendants rely primarily on *United States v. Donaway*, 447 F.2d 940 (9th Cir. 1971). In *Donaway*, a Ninth Circuit panel found the placing of one bet to be a "sporadic casual involvement" in, rather than a "continuous course" of, criminal activity proscribed by the Travel Act. *Id.* at 944.

 Neither evidence of large-scale operations nor long-term duration is required to support a Travel Act conviction. *United States v. Cozzetti*, 441 F.2d 344, 348 (9th Cir. 1971). Instead, what must be shown is evidence of a continuous enterprise and one act in interstate commerce in furtherance of that enterprise. *See United States v. Teemer*, 214 F.Supp. 952, 958 (N.D.W.Va. 1963). Considering the quantity of cocaine involved in the prior transaction proved at trial, the jury could reasonably find a continuous course of criminal activity. Viewing the evidence in the light most favorable to the verdict, we do not find clear error. *See United States v. Anderson*, 642 F.2d 281, 284 (9th Cir. 1981). The defendants also contend that the evidence did not show a "continuous" use of interstate facilities. The statute does not, however, require such proof. Once a showing of a continuous enterprise is made, a showing of one transaction in interstate commerce is sufficient to sustain a conviction under section 1952(a). *See, e. g., United States v. Teemer*, 214 F.Supp. at 958. We reject the defendants' contention.

## VII. PROPRIETY OF SENTENCES AND SPECIAL PAROLE TERMS

### A. Job's Sentence

Job contends first that he was incorrectly sentenced under 21 U.S.C. § 960 (1976), rather than under 21 U.S.C. § 846 (1976), on Count I. We reject the contention. He was not sentenced under 21 U.S.C. § 960 (1976), but only given a special parole term under that provision.

 Job also contends that his consecutive sentences were illegally imposed because they arose from a single transaction and identical facts and because a conspiracy is not an offense punishable separately from one under the Travel Act. *See Iannelli v. United States*, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n.17, 43 L.Ed.2d 616 (1975); *United States v. Kearney*, 560 F.2d 1358, 1365–67 (9th Cir.), *cert. denied*, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977). Proof of a violation of 21 U.S.C. § 846 requires showing the elements of (1) an agreement to violate the statute (2) with intent to commit the underlying substantive offense and (3) a subsequent overt act in furtherance of that agreement. *E. g., United States v. Melchor-Lopez*, 627 F.2d 886, 890 (9th Cir. 1980). Proof of a violation of 18 U.S.C. § 1952 requires showing the elements of (1) interstate travel or use of an interstate facility (2) with intent to promote an unlawful activity and (3) an overt act in furtherance of the unlawful activity. *United States v. Wander*, 601 F.2d 1251, 1258 (3d Cir. 1979). The interstate element of section 1952 is not required under section 846 and the agreement element of section 846 is not required under section 1952. In the special context of narcotics offenses, we have recently held that convictions for conspiracy and the substantive offense under 21 U.S.C. §§ 841(a)(1), 846 (1976) are permissible. *United States v. Wylie*, 625 F.2d 1371, 1381 (9th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981). By analogy from *Wylie*, we uphold

the convictions for conspiracy and Travel Act violations. *See United States v. Stevens,* 612 F.2d 1226, 1231 (10th Cir. 1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980).

*B. Both Defendants' Special Parole Terms*

 Job argues, and the government concedes, that the special parole terms imposed on both defendants under 21 U.S.C. § 846 (Count I) are improper under *Bifulco v. United States,* 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980). In *Bifulco,* the Supreme Court held that section 846 does not authorize the sentencing court to impose a special parole term [2] on a defendant convicted of conspiracy to manufacture or distribute a controlled substance. *Id.* at 400–01, 100 S.Ct. at 2259. We therefore vacate the special parole terms imposed on both defendants.

Affirmed in part and vacated in part.

**2.** A "special parole term" is a term of two years minimum imposed in addition to a term of imprisonment: If the special parole is violated, the original term of imprisonment may be increased by the period of the special parole term. *See* 21 U.S.C. § 841(b)(1)(B) (1976 & Supp. II 1978); *Bifulco,* 447 U.S. at 384–85, 100 S.Ct. at 2250–51.